Rtjffiw, Chief Justice.
 

 — The first objection taken to the plaintiff’s recovery, and to the instructions of the Judge who tried the cause, is founded upon the deed made by the plaintiff’s intestate, to the trustees of the Society of Friends, which is set forth at large in the record. It purports, in consideration of affection for the society, and other good causes and considerations, to convey and grant “ unto Mordecai Morris, Joshua Trublood, and
 
 others,
 
 
 *264
 

 trustees for said society,
 
 to and for the use of the said society,” the several slaves in controversy, besides others. The Court stated to the jury, that if the object of this deed was to afford to the slaves the privileges and enjoyments of freemen, whilst they were to be held only nominally as slaves, it was void in law, as being against the public policy.
 

 The counsel for the defendant admits, that as trustees, Morris and Trublood cannot take the slaves with the intent supposed by the Judge, because they can, in that character, take such things only as are to be held for the benefit of the society. But it is contended, that the trustees have individually a capacity to take, and that the title vested in them as individuals, upon the principle, that the deed shall operate in some way,'to make it effectual.
 

 That principle is resorted to in favour of the intention of the parties,
 
 at res magis valeat quarn pereat.
 
 The rule of construction is the intention, as well of deeds as of wills, and there is a presumed intention that every instrument shall have the effect to pass the property mentioned in it, between the parties to it, arid in the characters therein given to them. But if, from the nature of the conveyance, it cannot operate at all according to its obvious import, it shall do so in any other which its terms will allow, and which is not inconsistent with the principal intention, as collected from the deed itself. Hence a deed which is in form a feoffment or release, may be good as a bargain and sale, or a covenant to stand seised. But that reason is not applicable to the case under consideration. This deed upon its face may operate to convey the slaves to the trustees, as trustees, and does so operate, for aught that appears upon its face. It purports to be for the use and benefit of the society, and there is nothing to restrain a donation of slaves, more than other property, to the use of a religious society. The deed, apparently, then, vests the estate in the grantees officially, which is the expressed intention of it. As a conveyance of that sort, it is avoided by matter dehors, namely, that the property was not for the use of the society, as expressed. The question then arises, whether a new operation, which is against both the
 
 *265
 
 words and the intention declared in the deed, can be given to it, so as to vest the title for the beneficial use of the grantees. We think not; for the reason why the deed in ? , . its natural sense is not valid, is, that the real purpose was a fraud upon the law, and that furnishes no ground for enabling the trustees to commit a further fraud on the society and the former owner. This is not like the case of
 
 Stevens
 
 v.
 
 Ely,
 
 1 Dev. Eq. Ca. 493; for there the grantee had only a natural capacity. Here the trustees have a
 
 quasi
 
 corporate capacity, as their successors are to take; but they have no corporate
 
 name,
 
 and therefore, of necessity, a conveyance must be to them in their proper names, adding their official (if I may so call it,) designation, so as to show the character in which they take. Nor is it like the office bonds given to the Justices of the County Courts. They may operate at common law, because there is nothing unlawful in taking a bond to the Justices in either capacity. But here the law forbids the purpose of this deed, whoever may be the grantee; and if it cannot, for either reason, be effectual to the parties as trustees, the same reason must prevent the Court from making the deed, by construction, a deed to the individuals.
 

 It is further objected, that the letters of administration to the plaintiff are void, because they do not purport to be
 
 de bonis non.
 
 It is true, they are not expressly so, but they recite the appointment of executors in the will, the probate of the will, and the death of the executors; so that substantially they are of the character which it is insisted they ought to be in point of form. Although it might have been more regular to have given them that special form, yet is only an irregularity, we think, which does not avoid them, but renders them voidable ; and until repealed, they give to the plaintiff the rights of administrator.
 

 Another question, of much importance, and not a little difficulty, has been made upon the effect of the deed of emancipation, made by old Mr. Joshua White, in Decern-ber, 1776. On the part of the plaintiff, it has been contended, that it was merely void for the want of capacity in the slave to take, and because it was forbidden by
 
 *266
 
 the act of 1741. While for the defendant it is contended, that the master may renounce his ownership, and that the slave being a reasonable being, thereby acquires the same relation to society that any other person has, and that the statutes do not restrain the acts of the master, in reference to his own rights or interests, but only in respect to the public interest, and therefore, that the act of manumission is not void, but produces a forfeiture. If the slave be forfeited, the plaintiff has no right. In the Superior Court it was held, that the deed was void; or that no seizure was made by the churchwardens or the sheriff; the property of the former owner remained. Upon consideration of the act of 1741, it seems to the whole Court, that a deed of emancipation did operate to extinguish immediately all the rights and powers of the master since the slave was declared to be absolutely free, in case he left’ longer than a certain time. If the slave did not go away, or returned, the churchwardens were to seize and sell it absolulely, without any power reserved to the master to reclaim the slave under any circumstances. The construction is a necessary one, that no ownership under any qualification remained in the master, and consequently, that either an immediate forfeiture
 
 to the state took
 
 place by way of punishment, to the ovrner and slave for the nuisance, or the property, being derelict, vested in the sovereign, and was subject to such disposition as the legislative authority prescribed. The doubt upon this part of the case arises out of the terms of the deed of 1776, which purports to renounce the interestsand “ pretensions of claims” to the slave, not immediately, but eight years afterwards, at her arrival at the age of eighteen. There would be no hesitation in treating such an instrument as an act of unequivocal emancipation, with a reservation of service for a period as an apprentice or indented servant, in a country where emancipation was encouraged, or even tolerated. Much slighter matters, as making a contract with the slave, or suing him, have been, in favour of liberty, caught at, as being
 
 per se
 
 manumissions, because inconsistent with the state of servitude. But emancipation was not favoured in the province, and only allowed under circum
 
 *267
 
 stances; and if this deed be construed as conferring it immediately, the necessary consequence of it would be an immediate forfeiture. For by the deed the servant was restrained from compliance with the statute, by leaving the province within six months, and unless she remained, the property of White was subject to sale by the wardens. We think a Court would have hesitated to put such a construction on it, merely for the sake of the forfeiture, before the expiration of the time of service specified in it; because it would be inflicting the punishment prospectively in anticipation of the practical nuisance to arise
 
 in future.
 
 This view was taken of the subject by the counsel for the plaintiff; who argued, that the deed never became operative, because, before the expiration of the time, the acts of 1777 and 1779, made emancipation unlawful^ and all attempts to grant it void, except license was had from the Courts.. Upon that position the Court entertains the most serious doubts. It is extremely questionable upon the purviews of those acts, whether unlawful emancipa-tions are void, in the sense of leaving the property in the former owner, either absolutely or subject to be divested by a seizure of the slave, in the nature of an office found. The question has never been decided, though the intimation has more than once been given by eminent Judges, that public policy required, that the slaves should be forfeited, even where they were conveyed by deed to another person, for'the purpose of future emancipation. All the cases have arisen upon wills or deeds upon that trust. There was no act of emancipation in any of them. In the case of executors, it was of course held, that a trust resulted to the next of kin; and upon the deeds, that they were either void for the want of capacity in the grantees to take, as in
 
 The Trustees
 
 v.
 
 Dickerson,
 
 1 Dev. Rep. 189, or, as in
 
 Stephens
 
 v.
 
 Ely,
 
 1 Dev. Eq. Rep. 493, that the legal estate passed on a void trust, which therefore resulted. There has been no case upon a direct and immediate act, professing in itself to be an emancipation, until the present; and the Court declines deciding it without further consideration, as it is not necessary for the purposes of this suit. It is clear, we all think, that the acts contemplate other
 
 *268
 
 attempts at emancipation, besides the admitted one by license; for it prescribes the consequences and punishment for them. It is clear, they cannot be effectual to constitute emancipation, even qualified, or for any purposes ; for the slave remains a slave, and as such is to be sold, as one of the consequences. But the question is, whose slave ? Does the title pass to the state instead of the slave, or does it remain in the owner, liable to be defeated by seizure for the public, and until such seizure can he reclaim the slave from any other possessor? To the defendants in this case, the answer is of but little consequence, since either way it implies that he has no title; but to the plaintiff it is important, as he might recover, unless the sovereign be already the owner.
 

 There are, however, other points in the case which appear to us, to be conclusive against the plaintiff, and render an opinion upon the last unnecessary. In another case brought by the present plaintiff, upon thesame title, the Court had occasion to consider of the construction of the will of Joshua White,
 
 (vide
 
 4 Dev. Rep. N * 257.) By it he gives to his son Jacob, a tract of land « ancj als0 every other article I have already possessed him .
 
 *
 
 with.” The Court charged the jury, that the assent of the executor was necessary to pass a legacy, and left it to them to presume it from the evidence of the long posses-si°n and other circumstances, and also that if Jacob was jn possession of the slave Hager, at the date of his father’s will and his death, she did pass by the bequest set forth. think that ordinarily this charge would be correct. But the question is, what was meant by an
 
 article,
 
 of wh*ch the testator had possessed his son ? It could only mean such things as he claimed as property, and which he had delivered as property. It has been argued for the defendant, that for this reason, this clause could not cover the slave, because being a Quaker, the testator held that be could not have a property in a negro. We do not assent , .., ,,7, to that proposition; because although the testator might deny the moral right to hold one in slavery,yet he might well understand, that legally, the title was in himself, and for that very reason, might have placed the slave under
 
 *269
 
 the care of his son in his lifetime, and intended to give her to him by his will, under the expectation that he would not use the legal title, inconsistently with the moral right, as he conceived it. But if on the other hand, the friends of that day, and in particular the testator, thought that he had divested himself, by his deed, of the legal title also, then, however it might be in law, he could not have placed the slave with his son as property, either beneficial or merely legal and nominal; and she cannot therefore be considered as a specific parcel of the bequest to the son. The deed of emancipation, the tenets of the society, the declarations of the son, the inventories of the estates, and the deed of the son, constitute evidence upon this subject, on either side, which made it so far doubtful, as to render it proper that it should have been left as a question of fact to the jury, whether the testator claimed a legal ownership, either generally or for a term, in the slave, and as such put her into his son’s possession, in order to determine whether she was included in that clause of his will. The presumption is in the affirmative, from the fact supposed, that the negro was a slave and in the son’s possession ; which is not rebutted by the mere circumstance, that the testator thought she ought not to be a slave. It is requisite that he should think she was not a slave in law, and that the jury should believe that he thus thought. As there was evidence on both sides upon that point, we think the Court erred in determining it conclusively upon the mere words of the will.
 

 As to the assent of the executor, there seems to be no reason to question the instruction, if it be assumed that the slave is included in the bequest, for long possession without disturbance from the executor is evidence of his assent.
 

 Another exception not less formidable to the plaintiff’s action, is taken to the opinion of the Court upon the statute of limitations. From 1809, the defendant and his predecessors, as trustees, have assumed to have the legal title to these slaves, have hired them at some periods, and claimed to have the legal control over them at all times, though as a matter of conscience, they disavow the moral
 
 *270
 
 right of applying to their own use, or that of the society, the fruits of their labour, and allow the slaves themselves to enjoy them. Jacob White, the plaintiff’s testator, held the possession of the negroes under the trustees, and by their consent. His will was proved in 1816, and his wife, who was an executrix of the will, but never qualified, retained the possession until her death in 1823. The executor died in 1820, but never interfered with the negroes nor claimed them, and the testator does not dispose of them by his will, unless they are included in the residue. In the lifetime of the widow, the present plaintiff, who is one of the residuary legatees, claimed the negroes from the defendant, who refused to deliver them, and claimed them as a trustee of the society. The Court charged the jury, that the possession of the trustees, if it was entirely with the view of benefitting the slaves, by allowing to them the enjoyments of freemen, without regard to the profit of the society, did not bar the plaintiff’s action, for only an adverse possession of a person claiming a beneficial interest or property in some person, would have that effect.
 

 It seems to the Court that the «statute runs, whenever the cause of action accrues, and that the action of the owner of a slave, arises from the fact of the detention or conversion of the slaves, and not from the intent upon which that detention or conversion was made. The defendant has now the same possession he has ever had. Is it of a qualified nature ? Does he claim only a qualified right in a legal sense, subject to the claims of any other person of a different or higher legal efficacy than his own
 
 1
 
 It is true, that an adverse possession, is, in its nature, founded upon the claim of exclusive possession, and that involves a benefit either to the possessor, or some other person; but that is so, because we attach to the idea of the possession of what is property, the further idea of benefit or profit. But the wrong to the owner, does not depend upon the fact of profit to the possessor or his expectation of it; but upon the denial of his right and his exclusion from the possession. He who withholds my slave upon the allegation that he is a freeman, holds him
 
 *271
 
 adversely to me, and ousts my possession. If this be continued for three years, it does not indeed make the slave free; but it bars my action, for the detention or the conversion. If this were not, no time would be a bar in trover for a conversion in sending the slaves out of the country, to Liberia, for instance; or, on the other hand, a person having the scruples, professed by the defendant and other friends, upon the lawfulness in conscience of a property by one man in another, never could be guilty of a conversion or detention of a slave. We think neither proposition is correct; but that the defendant may detain and convert a slave like other men, and that the statute will in like manner, bar an action therefor against him or against others. The defendant’s possession, was not that of a finder for the owner, not knowing who was the owner; but it was a possession, upon a claim legal of title in himself, and a denial that there was any other owner. This possession upon such a claim, was inconsistent with the rights of the owner, if there should be any besides the defendant, and amounted to a conversion, and made the possession adverse to all the world.
 

 Upon this ground, it is the opinion of the Court, that the defendant was protected by the statute of limitation, and therefore there must be a new trial.
 

 Per Curiam. Judgment reversed.